

**New York University**
*A private university in the public service*

School of Law

40 Washington Square South, Room 307
New York, New York 10012-1099
Telephone:   (212) 998-6172
Fax:            (212) 995-4341
Email:         burt.neuborne@nyu.edu

**Burt Neuborne**
*Inez Milholland Professor of Civil Liberties*
*Legal Director, Brennan Center for Justice*

D-7
09 CU 160
**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ **MAY 2 6 2010** ★

May 11, 2010        **BROOKLYN OFFICE**

Hon. Edward R. Korman
Judge
United States District Court
  for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: In re Holocaust Victim Assets Litigation
Civ. No. 96-4849 (ERK)

Your Honor:

At the Court's request, I enclose a memorandum setting forth my understanding of the Court's legal options in connection with the allocation of undistributed funds, if any, remaining in the settlement fund at the close of all claims proceedings. As you can see, I recommend the entry of an order authorizing the CRT to begin the time consuming process of distributing up to $100 million in potential undistributed settlement funds to members of the Deposited Assets class who have received "presumptive value" awards. The additional payments would be designed to increase the value of a "presumptive value" award in response to Special Master Junz's report and recommendation.

If any additional undistributed funds remain in the settlement fund after the distribution of $100 million to "presumptive value" claimants, I believe that the Court is empowered to distribute the funds *cy pres* for the benefit of the poorest members of the Looted Assets class pursuant to a formula designed to reach the neediest of the class members at the Court's informed discretion, or to distribute such funds to members of the Deposited Assets class who have received "plausible but undocumented" awards.

Sincerely yours,

Burt Neuborne

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X
                               :

                               :    **Case No. CV 96-4849 ERK)(MDG)**

**IN RE: HOLOCAUST VICTIM ASSETS:**        **(Consolidated with CV 96-5161**
      **LITIGATION**              :    **and CV 97-461)**

                               :

                               :

                               :
-----------------------------------------------------X

**Memorandum of Lead Settlement Counsel in**
**Connection With the Distribution of Funds, If Any,**
**Remaining in the Settlement Fund At the Close of All**
**Claims Processes**

The Court has requested Lead Settlement Counsel to provide it with a memorandum concerning potential legal issues raised by the distribution of funds, if any, remaining in the settlement fund at the close of all current claims proceedings. Lead Settlement Counsel and the Court had hoped that the interested parties would agree on a formula for the distribution of unclaimed funds, if any. Unfortunately, it appears that the interested parties have failed to agree, rendering it necessary for the Court to resolve the issue as a matter of law.

<u>The Factual Background</u>

The court-approved settlement agreement in this case,[1] designed to benefit a defined group of victims of Nazi persecution,[2] established five settlement classes: a Deposited Assets class, consisting of defined victims of Nazi persecution claiming ownership of Swiss bank accounts; a Slave Labor I class, consisting of defined victims of

---

[1] The District Court has approved the settlement's fairness under Rule 23(e). *In re Holocaust Victim Assets Litig.*, 105 F. Supp.2d 139 (E.D.N.Y. 2000). An appeal to the Second Circuit from the Court's fairness order was withdrawn on May 15, 2001, rendering the District Court's fairness order final.

[2] The definition of victim of Nazi persecution used in the settlement agreement was upheld by the Second Circuit. *In re Holocaust Victim Asset Litig.*, 225 F.3d 191 (2nd Cir. 2000).

1

Nazi persecution who were forced to work in German slave labor facilities built and maintained with the financial involvement of Swiss banks; a Slave Labor II class, consisting of persons who were forced to perform slave labor for Swiss corporations; a Refugee class, consisting of defined victims of Nazi persecution who were excluded from Switzerland, deported from Switzerland, or mistreated while in Switzerland, because of their ethnic or religious status; and a Looted Assets class, consisting of defined victims of Nazi persecution who were subjected to looting by the Nazis, and whose property was knowingly disposed of through Swiss entities.

Four settlement classes – Deposited Assets, Slave Labor I and II, and Refugee – have been administered on an individualized claims basis approved by the Court. It proved impossible, however, to administer an individualized Looted Assets claims program because, although it is clear that massive amounts of looted Nazi property was disposed of through Switzerland, inadequate records have survived tracing particular looted items to Switzerland. With the approval of the United States Court of Appeals for the Second Circuit,[3] instead of terminating the Looted Assets class as unadministrable, the District Court has administered the Looted Assets class on a *cy pres* basis on behalf of the class's poorest members. On November 22, 2000, the District Court approved a plan of allocation and distribution proposed by Special Master Judah Gribetz,[4] pursuant to which the Deposited Assets class was allocated up to $800 million; the Slave Labor I and II classes were allocated $1,000 (subsequently increased to $1,450) per qualifying member; the Looted Assets class was allocated $100 million (subsequently increased to

---

[3] *In re Holocaust Victim Asset Litig.*, 424 F.3d 132 (2nd Cir. 2005), cert denied 126 S. Ct. 2891 (2006)

[4] *In re Holocaust Victim Asset Litig.*, 2000 WL 33241660 (E.D.N.Y. November 22, 2000), aff'd 413 F.3d 183 (2d Cir. 2001).

$205 million); the Refugee class was allocated either $2,500 or $500 depending upon whether the qualifying member was expelled from/denied entry into Switzerland, or was admitted but mistreated (subsequently increased to $3,625 or $725, respectively); and the Victims' List Project was allocated $10 million to assemble a list of all Holocaust victims. To date, in accordance with the court-approved plans of allocation and distribution, the following distributions have been made from the $1.25 billion settlement fund to almost 452,000 members of the five settlement classes: (A) Deposited Assets - approximately $574 million to nearly 18,000 owners of Holocaust-era Swiss bank accounts; (B) Slave Labor I - over $287 million to almost 198,000 survivors or heirs; (C) Slave Labor II - $826,500 to 570 survivors or heirs ; (D) Refugee - $11.6 million to over 4,100 survivors or heirs ; and (E) Looted Assets - $205 million to over 231,000 needy Holocaust survivors throughout the world. In addition, $10 million has been allocated to the Victims' List Project to assist in the compilation of a complete list of the victims of the Holocaust. Thus, to date, of the $1.25 billion Settlement Fund, over $1.09 billion has been distributed or allocated to members of the five plaintiff-classes. It is expected that by the time all claims processes are completed, more than 100% of the $1.25 billion principal will have been distributed to more than 452,000 Nazi victims or their heirs.

All claims programs have been completed in connection with the Slave Labor I, Slave Labor II, and Refugee classes. The full amount allocated to the Looted Assets class has been distributed or formally committed for scheduled future distribution in accordance with a *cy pres* formula approved by the Second Circuit.[5] The Deposited Asset claims program, administered under the Court's supervision by the CRT in Zurich, has

---

[5] *In re Holocaust Victim Asset Litig.*, 424 F.3d 132 (2nd Cir. 2005), cert denied  126 S.Ct. 2891 (2006). See also *In re Holocaust Victim Asset Litig.*, 424 F.3d 150, 159, 169 (2nd Cir. 2005).

processed more than 100,000 bank account claims, and has distributed $574 million to more than 18,000 class members. As the CRT approaches the end of the individualized claims process, it appears that, in the absence of any action by the Court, as much as $180 million (or as little as $0) may remain in the settlement fund at the close of the CRT process.[6] Lead Settlement Counsel submits this memorandum to assist the Court in planning the expeditious distribution of the balance, if any, remaining at the close of the CRT process.

1.   The Legal Status of Funds, If Any, Remaining
At the Close of the CRT Claims Process

As I have noted, it is possible that no balance will remain in the settlement fund at the close of the CRT process. If, however, a balance of as much as $180 million is available, what would be its legal status? In this Circuit, settlement funds undistributed at the close of a class action claims process are ordinarily subject to *cy pres* distribution for the indirect benefit of the class at the broad discretion of the Court.[7] If, however, the settlement agreement, including the court-approved plan of allocation, governs the funds, the balance must be distributed in accordance with its terms. Two recent cases illustrate the governing law. In the *Wilhelmina Model Agency* litigation cited in n.7, plaintiffs alleged violations of the Sherman Act in the setting of commissions charged to professional models by their managing agencies. After dismissing claims that had

---

[6] Several potentially significant bank account claims remain to be resolved by the CRT. It is possible that payment of the undecided claims will exhaust the settlement fund.

[7] In addition to the earlier Second Circuit cases cited above in n.5 upholding the plan of allocation and distribution in this case, the legal status of undistributed class action settlement funds is discussed in *Beecher v. Able*, 575 F.2d 1010 (2nd Cir. 1978); *Agent Orange Product Liability Litig.*, 818 F.2d 179 (2nd Cir. 1987); *Masters v. Wilhelmina Model Agency*, 473 F.3d 423 (2007); *Fears v. Wilhelmina Model Agency*, 315 Fed. Appx. 333 (2nd Cir. 2009); and *White v. First American Registry*, 592 F. Supp. 2d 681 (S.D.N.Y. 2009).

4

accrued prior to the four year statute of limitations, the District Court certified the plaintiff class. The case eventually settled for approximately $22 million, with the settlement fund payable on an individualized claim basis to members of the plaintiff class who had been charged a commission in excess of 10%.[8] The settlement agreement explicitly delegated power to the supervising District Judge to determine the disposition of unclaimed funds. At the close of the claims process, a substantial undistributed balance remained in the *Wilhelmina* settlement fund. The parties suggested two options to the District Court. Counsel for the plaintiff class urged an increase in the amounts already paid to claimants to reflect their possible claim to treble damages under the Clayton Act. Defendants urged a distribution to various charities having some connection to the plaintiff-class.[9] The trial court, after expressing doubt concerning its power to consider a Clayton Act rationale for increased awards, ruled that the undistributed funds should be awarded to charity. The Circuit vacated the District Court's allocation ruling, holding that plaintiffs' Clayton Act treble damages theory was a legally valid basis for allocating undistributed funds to increase payments to successful claimants. The Circuit remanded to allow the District Court to exercise its discretion under the settlement agreement. On remand, the District Court re-affirmed its decision to allocate undistributed funds to

---

[8] The District Court adopted a "percentage of the fund" approach calculating attorneys' fees, but limited the fund to the sum actually paid to claimants. The Court awarded a fee of $3.7 million, which it characterized as approximately 40% of the claims actually paid, or 17.2% of the entire settlement fund. The Circuit reversed the fee calculation, holding that if a court adopts a "percentage of the fund" approach to attorneys' fees, the calculation must be based on the size of the settlement fund, not the claims actually paid. On remand, the District Court appears to have declined to increase the fee award.

[9] The charities included a women's cardiac unit, eating disorder and substance abuse programs, a program on ovarian cancer, and the Legal Aid Society. I suspect that the parties' difference of opinion about allocation had more to do with the potential effect on fee calculation, than on a principled disagreement over where the funds should go. Increasing payments to claimants, under Judge Baer's initial fee calculation, would have increased the plaintiffs' fees. Allocating funds to charity would have had no impact on the fees. Ironically, the Circuit's later ruling on fee calculation eliminated the difference.

charity. The Circuit then affirmed the allocation order, but vacated and remanded, once

again, for an explanation of why no change had been made in the calculation of

attorneys' fees.

In setting forth the governing legal principles, the Circuit noted that while the

settlement agreement would ordinarily govern a District Court decision concerning

undistributed funds, a District Court's discretion is not absolute.

> Where we find an abuse of discretion in our review of the allocation of
> funds derived from class settlements, the scheme adopted by the District
> Court will not be upheld. *In re Agent Orange Prod. Liab. Litig. VI*, 818
> F.2d 179, 181 (2nd Cir.1987). We have concluded that a district court
> abuses its discretion when "(1) its decision rests on an error of law (such
> as application of the wrong legal principles) or a clearly erroneous
> factual finding, or (2) its decision – though not necessarily the product of
> a legal error or a clearly erroneous factual finding – cannot be located
> within the range of permissible decisions." *Zervos v. Verizon New York,
> Inc.*, 252 F.3d 163, 169 (2nd Cir. 2001).

As I read the *Wilhelmina* decisions, the District Court's discretion under a

class action settlement agreement to allocate undistributed funds is very broad. In

exercising its discretion, the District Court may - indeed, must - consider the legal

claims of class members to additional individual distributions, but, even when

such legal claims are plausible, the Court may also consider equitable

considerations calling for the *cy pres* distribution of the funds in ways that

indirectly benefit the class.

In *White v. First American Registry*, 592 F. Supp. 2d 681 (S.D.N.Y.

2009), the District Court denied an application to allocate unclaimed funds to

assist "blacklisted" tenants in obtaining legal representation. The Court

recognized that allocation of the funds to educational programs was consistent

with the settlement agreement, but found that funding of legal representation in

future litigation was beyond the scope of the agreement, and, thus beyond his powers. *White* counsels that in making any allocation decision concerning unclaimed funds, a District Court is significantly constrained by the rights of the parties under the settlement agreement.

## A. The Legal Claims of the Deposited Assets Class

In this case, the District Court has approved an allocation plan providing for "up to $800 million" to the Deposited Assets class. Accordingly, under the settlement agreement, the members of the Deposited Assets class have a presumptive claim to receive $800 million from the settlement fund. If the Court were to take no further action, a significant shortfall of at least $100 million[10] may well exist between the amounts actually distributed to the Deposited Assets class and the "up to $800 million" recited in the allocation plan. If, as in both *Wilhelmina* and *White*, such a shortfall is attributable to the class members' inability or failure to establish their individual claims, the failure to reach $800 million would have no legal significance, and any balance may be distributed *cy pres* at the Court's discretion. If, however, the shortfall is attributable in whole or part to a flaw in the claims process, however inadvertent, the Deposited Assets class members would have a legal claim on any undistributed balance in order to correct the effects of the flaw.

Two potential flaws exist in the Deposited Assets claims process, both of which flow from the indefensible conduct of the Swiss banking community in destroying millions of bank records needed to verify many bank account claims. As the Court recalls, in 1997, shortly after the filing of this litigation, plaintiffs demanded access to

---

[10] Thus far, the Deposited Assets class has received $574 million. I am assuming that the CRT may award as much as an additional $125 million before the close of the claims process, bringing the total to $700 million. The actual figure may be higher or lower.

Swiss bank records in order to search for unpaid Holocaust-era accounts. Defendants resisted the discovery demands, arguing that Swiss law would make it a crime for the banks to comply with such a discovery order. The District Court expressed concern over whether it possessed power to grant plaintiffs' discovery request. In an effort to resolve the impasse, the Swiss government authorized an Independent Committee of Eminent Persons (ICEP), headed by Paul Volcker, to conduct a comprehensive audit of Swiss bank records in an effort to identify unpaid accounts "probably or possibly" owned by Holocaust victims or their heirs. The Volcker auditors eventually identified 36,000 unpaid Swiss bank accounts as "probably or possibly" owned by Holocaust victims. After protracted negotiations, plaintiffs persuaded the Swiss government to authorize publication of the names of the owners of approximately 24,000 accounts on the Internet, and to make the bank records of all 36,000 accounts available to a court-supervised claims administrator, the Claims Resolution Tribunal, operating in Zurich as an arm of the District Court.

The Volcker auditors also learned that, of the 6.8 million Swiss accounts open during the relevant period from 1933-45, Swiss banks had destroyed all records relating to almost 2.8 million accounts, making it impossible to determine ownership of the nearly three million lost accounts, and had destroyed the transactional records relating to most of the remaining accounts, rendering it virtually impossible to determine the amounts on deposit in many accounts. In order to make a bank account claims program possible, the Volcker auditors, using their Swiss government-granted access to all surviving Swiss bank records, calculated a series of "presumptive values" for varying categories of Swiss bank accounts. The Volcker auditors based their calculations of presumptive value on an

average of all known-value accounts open during the relevant period. After a hearing in January 2001, the District Court, on February 5, 2001, accepted the Volcker auditors' presumptive value calculations as part of the CRT's Rules and directed that the presumptive values be utilized by the court-established CRT in awarding accounts for which no records survive indicating accounts' actual value.

As the CRT carried out its duty under the settlement agreement to investigate and adjudicate more than 100,000 claims to Swiss bank accounts, new information became available suggesting that the Volcker auditors had inadvertently underestimated the so-called "unknown-value" accounts' presumptive values. Special Master Junz found that information in the records of 7,000 known-value accounts owned by Holocaust victims, much of which was unknown to the Volcker auditors, indicated that the Volcker estimates were too low. Accordingly, she recommended an upward revision of all presumptive value awards. If the Court accepts Special Master Junz's report and recommendation, those members of the Deposited Assets class who received presumptive value awards would become legally entitled to an additional payment to compensate for any inadvertent undervaluation.

I believe that such a legal claim to an updated presumptive value calculation is comparable to, and perhaps stronger than, the potential treble damage legal claim in *Wilhelmina*. As I read the Second Circuit opinion in *Wilhelmina I*, the Circuit viewed the Clayton Act treble damage claim as a plausible legal theory empowering the District Court to increase a successful claimant's award beyond the sums already received from the settlement fund. The Circuit then held in *Wilhelmina II* that the District Court was empowered to override the plausible Clayton Act legal claim in favor of an equitable *cy*

*pres* award to charity. Applying *Wilhelmina I* and *II* to this case, the plausible legal claim of presumptive value recipients to an increased distribution is roughly analogous to the plausible legal claims of the class members in *Wilhelmina* to an increased award. Moreover, the equitable claim of the poorest members of the Looted Asset class herein is roughly analogous to the *cy pres* interests of the class members in *Wilhelmina*. If *Wilhelmina* governs, therefore, the Court would have plenary discretionary power to award some or all of any undistributed funds to either or both sets of claimants. In my opinion, the crucial question is whether the legal claim to an upward revision in presumptive value in this case is so much stronger than the Clayton Act claim in *Wilhelmina* as to eliminate the Court's discretion. Although the question is close, I believe that the claim to an upward revision of presumptive value in this case is stronger than the Clayton Act theory in *Wilhelmina*, but not so much stronger as to completely eliminate the Court's discretion. While I deeply respect the extraordinary efforts of both the Volcker auditors and Special Master Junz, the reprehensible actions of the Swiss in destroying so much of the relevant record leave even the best efforts at reconstruction of that record with an element of uncertainty. In my opinion, it is that inevitable uncertainty that vests the Court with power to recognize the strong equitable claim of the poorest survivors to at least a portion of any undistributed funds. Accordingly, while I believe that the legal strength of the claim to an upward revision of the presumptive value awards entitles presumptive value recipients to a significant portion of any undistributed assets, the claim does not entirely extinguish the Court's discretion to award a portion of the undistributed assets for the support of the poorest survivors.

10

A second potential flaw in the Deposited Assets claims process relates to the Swiss destruction of all trace of 2.8 million bank accounts open during the relevant period, making it impossible for the CRT to validate claims to the "lost accounts." In order to deal with the information void, the CRT, with the permission of the Court, recognized a category of "plausible but undocumented" claims, and awarded those claimants a symbolic payment of $5,000 each designed to reflect the CRT's belief in the validity of the claim, but its inability to validate a full award. I believe that claimants who have received such a "plausible but undocumented" award also have a potential claim to additional funds similar to the treble damage claim in *Wilhelmina*. But, unlike the presumptive value claimants, the "plausible but undocumented assets" claim for upward revision is no stronger than the Clayton Act claim in *Wilhelmina*, and may well be weaker. Accordingly, I believe that the District Court enjoys plenary discretion to allocate any undistributed sums between "plausible but undocumented" claimants and the poorest members of the Looted Assets class. Both sets of claims are essentially equitable in nature.

### B. The Equitable Claims of the Looted Assets Class

Members of the Looted Assets class do not appear to have plausible legal claims to undistributed funds. Under the settlement agreement, the Looted Assets class would have been entitled to compensation for the value of property looted by Nazis and knowingly "fenced" through Swiss institutions. Unfortunately, it proved impossible to determine whether individual items of looted property were disposed of through Switzerland, or through the many other avenues used by Nazis to fence stolen property. Instead of decertifying the class as unadministrable, however, the District Court elected

11

to administer it on a *cy pres* basis on behalf of the class's poorest members. The plan of allocation and distribution awarded $100 million to the Looted Assets class. Not only has the class received the full $100 million, the Court has increased the allocation to $205 million, resulting in receipt, to date, by the Looted Assets class of more than twice its original legal entitlement. Accordingly, no plausible legal duty exists to provide additional funds to the Deposited Assets class.

There are, however, powerful equitable arguments for providing additional support to the extremely poor Holocaust survivors who are the recipients of Looted Assets distributions. Unlike most members of the Deposited Assets class who are one or more generations removed from the Holocaust, Looted Assets recipients are, by definition, actual victims. Moreover, they are actual victims in desperate need. Accordingly, a powerful equitable claim exists to allocate at least a portion of any unclaimed balance to aid the poorest surviving victims of the Holocaust.

The Court, recognizing such an equitable concern, invited interested parties to agree on an allocation plan that would permit the Court to benefit Looted Assets class members, while making it unnecessary to rule on the conflicting legal and equitable interests. Unfortunately, it does not appear that such an agreement will be forthcoming. In the absence of such an agreement, the Court is in the unenviable position of being required to balance the powerful legal claims of the Deposited Assets class to an upward revision of "presumptive value" and "plausible but undocumented" awards, against the powerful equitable claims of the Looted Assets class to continued support of the poorest survivors.

I have urged the Court to recognize that the inevitable uncertainty caused by the

passage of time, and by the Swiss banks' massive destruction of the records, would justify judicial acceptance of an amicable agreement between and among the interested parties for the equitable allocation of any undistributed balance – an equitable distribution that might have provided a significant sum to the members of the Looted Assets class who are in great need. Unfortunately, no such agreement appears likely. Even in the absence of such an agreement, however, I believe that it is possible to read *Wilhelmina* to authorize a District Court to balance the legal claims of class members to additional payments against the equitable claims of other class members to *cy pres* payments, and to reach a discretionary allocation premised largely on equitable grounds. In candor, I believe that the legal claims by recipients in *Wilhelmina* to an upward revision to reflect possible treble damages were weaker than the legal claims of "presumptive value" claimants to an upward revision reflecting the best information currently available to the Court. However, given the inevitable difficulty of reconstructing a lost historical record, I believe that enough uncertainty exists to permit an award of a portion of the funds to the poorest survivors.

Accordingly, I recommend that $100 million be allocated immediately to permit the CRT to begin the time-consuming process of distributing compensatory payments to the recipients of undervalued presumptive value awards. If, at the close of the CRT process, additional funds remain undistributed over and above the $100 million allocated to presumptive value claimants, I believe that the Court would have discretion under *Wilhelmina* to balance the essentially equitable claims of "plausible but undocumented" Deposited Assets claimants against the equitable claims of Looted Assets claimants, and

13

to allocate the balance, if any, to one or the other at the Court's discretion.[11]

### C. Geographical Sub-Allocation Within the Looted Assets Class

If the Court elects to award any additional funds to the Looted Assets class, it is free under governing law to make a discretionary geographical allocation on the basis of: (1) the whereabouts of the neediest victims; and (2) a consideration of the resources available to meet their needs. In making such a determination, the Court may wish to consider the relevance of newly established programs in the State of Israel to aid certain categories of poor Holocaust victims which have recently been described to the Court by counsel, as well as the significant migration to Israel and the United States of many impoverished survivors who had resided in the former Soviet Union, many of whom do not appear to fit within the category of victims recognized by the Israeli program. The ultimate geographical allocation decision unquestionably rests in the Court's informed discretion.

Dated: May 10, 2010

Respectfully submitted,

Burt Neuborne

---

[11] In view of the complex and expensive logistics involved, I do not believe that it would be feasible to make a second distribution to the presumptive value claimants