UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

IN RE:
HOLOCAUST VICTIM ASSETS
LITIGATION

---------------------------------------------------------------

This Document Relates to: All Cases

--------------------------------------------------------------- x

Case No. 09-160 (ERK)(JO)

(Consolidated with CV 96-4849, CV 96-5161 and CV 97-461)

## MEMORANDUM & ORDER APPROVING ADJUSTMENT OF PRESUMPTIVE VALUES USED IN THE CLAIMS RESOLUTION PROCESS AND AUTHORIZING ADDITIONAL PAYMENTS FOR DEPOSITED ASSETS CLASS PLAUSIBLE UNDOCUMENTED AWARDS

KORMAN, J.:

On July 26, 2000, I addressed and approved the fairness of the $1.25 billion settlement of the Holocaust Victim Assets Litigation against two leading Swiss banks, UBS and Credit Suisse. *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000). On August 9, 2000, a judgment was entered reflecting the approval of the Settlement Agreement. The judgment expressly retained jurisdiction over "the implementation of the settlement and distributions to plaintiff class members" as well as "the disposition of the settlement fund."

I assume familiarity with the underlying background of the case and its subsequent history. *See generally* Leonard Orland, A Final Accounting: Holocaust Survivors and Swiss

Banks (2010). Briefly, the Settlement Agreement established five settlement classes: a Deposited Assets class, consisting of defined victims of Nazi persecution claiming ownership of Swiss bank accounts; a Slave Labor I class, consisting of defined victims of Nazi persecution who were forced to work in German slave labor facilities built and maintained with the financial involvement of Swiss banks; a Slave Labor II class, consisting of persons who were forced to perform slave labor for Swiss corporations; a Refugee class, consisting of defined victims of Nazi persecution who were excluded from Switzerland, deported from Switzerland, or mistreated while in Switzerland, because of their ethnic or religious status; and a Looted Assets class, consisting of defined victims of Nazi persecution who were subjected to looting by the Nazis, and whose property was knowingly disposed of through Swiss entities.

On November 22, 2000, I approved a plan of allocation and distribution proposed by Special Master Judah Gribetz. *In re Holocaust Victim Asset Litig.*, 2000 WL 33241660 (E.D.N.Y. November 22, 2000), aff'd 413 F.3d 183 (2d Cir. 2001). Pursuant to the plan of allocation, the Deposited Assets Class was allocated up to $800 million; the Slave Labor I and II classes were allocated $1,000 (subsequently increased to $1,450) per qualifying member; the Looted Assets class was allocated $100 million (subsequently increased to $205 million); the Refugee class was allocated either $2,500 or $500 depending upon whether the qualifying member was expelled from/denied entry into Switzerland, or was admitted but mistreated (subsequently increased to $3,625 or $725, respectively). Each of these classes, except for the Looted Assets class, was administered on an individual claims basis. A $10 million allocation was also made to benefit "all members of all five classes" by creating "a comprehensive list, available to all, of all the Victims or Targets of Nazi Persecution, and all of their murdered ancestors." *In re Holocaust Victim Assets Litig.*, No. CV 96-4849 (E.D.N.Y. Sept. 11, 2000)

(Special Master's Proposed Plan of Allocation and Distribution of Settlement Proceeds) ("Special Master's Proposal").

In sum, the following distributions have been made to date from the $1.25 billion settlement fund to almost 452,000 members of the five settlement classes: (A) Deposited Assets - approximately $581 million to nearly 18,000 owners of Holocaust-era Swiss bank accounts; (B) Slave Labor I - over $287 million to almost 198,000 survivors or heirs; (C) Slave Labor II - $826,500 to 570 survivors or heirs ; (D) Refugee - $11.6 million to over 4,100 survivors or heirs; and (E) Looted Assets - $205 million to over 231,000 needy Holocaust survivors throughout the world. In addition, $10 million has been allocated to the Victim List Project. Thus, to date, of the $1.25 billion Settlement Fund, over $1.09 billion has been distributed or allocated to members of the five plaintiff-classes. It is expected that by the time all claims processes are completed, more than 100% of the $1.25 billion principal will have been distributed to more than 452,000 Nazi victims or their heirs.

I

I address here an issue that has arisen in connection with the Deposited Assets Class distribution process. While the class action was pending, Switzerland authorized an Independent Committee of Eminent Persons (ICEP), headed by Paul Volcker, to conduct a comprehensive audit of Swiss bank records in an effort to identify unpaid accounts "probably or possibly" owned by Holocaust victims or their heirs. The Volcker auditors eventually identified 36,000 unpaid Swiss bank accounts as "probably or possibly" owned by Holocaust victims. After protracted negotiations, Switzerland authorized the publication of the names of the owners of approximately 24,000 accounts on the Internet, and made the bank records of all 36,000 accounts available to a court-supervised claims administrator, the Claims Resolution Tribunal ("CRT"),

operating in Zurich as an arm of the District Court.

The Volcker auditors also learned that, of the 6.8 million Swiss accounts open during the relevant period from 1933-45, Swiss banks had destroyed all records relating to almost 2.8 million accounts, making it impossible to determine ownership of the nearly three million lost accounts, and had destroyed the transactional records relating to most of the remaining accounts, rendering it virtually impossible to determine the amounts on deposit in many accounts. In order to make a bank account claims program possible, the Volcker auditors, using the limited access the Swiss government had granted to surviving Swiss bank records, calculated a series of "presumptive values" for varying categories of Swiss bank accounts with unknown values. The Volcker auditors based their calculations of presumptive value on an average of certain known-value accounts open during the relevant period. On February 5, 2001, I accepted the Volcker auditors' presumptive value calculations as part of the CRT's Rules. I authorized the CRT to process claims to Holocaust-era Swiss bank accounts and to utilize "presumptive" (average) values to determine the amount of an award for a particular Holocaust-era Swiss bank account where bank records containing the actual valuation data no longer exist. Of the 4,616 accounts awarded to date, 4,057 have been paid using presumptive values (including 1,160 that had known values below presumptive value), while another 559 have been paid at the known values recorded in the bank files and other documentation.

As the CRT carried out its duty under the plan of allocation to investigate and adjudicate more than 100,000 claims to Swiss bank accounts, CRT Special Master Helen Junz conducted an extensive examination of the data underlying the presumptive values. Dr. Junz' studies have revealed that the average values of certain types of Swiss bank accounts owned by Holocaust victims are higher than the amounts that were estimated at the inception of the payment program.

Based on her analysis, she has recommended that the Court adjust upwardly the presumptive values to take into consideration the additional information that has become available as a result of the CRT's efforts to analyze and award Deposited Assets Class claims.

Specifically, Dr. Junz has recommended adjusting the Value Presumptions for Accounts with Unknown or Low Values, as set forth in Article 29 of the Rules Governing the Claims Resolution Process, as follows:

| Account Type | Current Presumptive Value | Recommended Presumptive Value |
|---|---|---|
| Custody Account | 13,000.00 | 31,000.00 |
| Demand Deposit Account | 2,140.00 | 2,500.00 |
| Savings/Passbook Account | 830.00 | 900.00 |
| Safe Deposit Box | 1,240.00 | 5,300.00 |
| Other Type | 2,200.00 | 3,900.00 |
| Unknown Type | 3,950.00 | 3,950.00 |

It is just such an approach -- updating the average values to incorporate new information learned from the claims process -- that was recommended by the Independent Committee of Eminent Persons led by Mr. Volcker. The Volcker Committee specifically had anticipated that the processing of individual claims and the study of the related bank records would yield data that would be incorporated into the claims process, including data concerning account values.[1] Michael Bradfield, who supervised the audit and, with Mr. Volcker, also developed the initial CRT Rules and procedures, has emphasized that the "proxy [or presumptive] values recommended by [the auditors] were based on the information that was available at the time that the calculations were done in 1999" -- *i.e.* before the claims process was under way. Now that the CRT has located new data as a result of its analysis of claims and accounts, Mr. Bradfield, who is now General Counsel of the Federal Deposit Insurance Corporation (FDIC), has advised:

---

Volcker Report, ¶ 36.

It would be clearly inconsistent with the Settlement Agreement not to utilize the important information that has been revealed as a result of the CRP [Claims Resolution Process], especially information about account values. As Mr. Hydoski, who led the original effort to estimate account values, stated "such data would have been used in the 1999 calculations had it been available" [citing Letter of Frank Hydoski to the Hon. Edward R. Korman, December 1, 2008, at 2].[2]

## II

Dr. Junz' conclusions -- and her methodology as well -- are far more accurate than the original presumptive values calculated by the ICEP auditors because she has taken into consideration several fundamental circumstances affecting the database from which presumptive values have been calculated. These factors have been described at great length both by Dr. Junz and in the related reports submitted by Special Master Gribetz and Deputy Special Master Reig. *See* CRT Special Master Junz' Proposal for Adjustment of Deposited Assets Class Presumptive Values: Additional Contextual Analysis of Her Supplemental Report (Apr. 9, 2009); CRT Special Master Junz' Proposal for Adjustment of Deposited Assets Class Presumptive Values in the Context of the Settlement Agreement and the Distribution Plan (Dec. 19, 2008). I incorporate those analyses by reference herein. For context, however, I briefly summarize these factors below.

(1)  *The auditors' original presumptive value recommendations and the anticipation that the claims process would reveal relevant account value information.*

The proxy (presumptive) values were analyzed after the Settlement Agreement had been reached in principle and the Swiss banks had begun to re-impose access restrictions upon the bank files (including the valuation data contained therein). Although the renewed restriction upon access to bank records was unfortunate, it was not deemed an obstacle to the

---

[2]  *Id.*, at 4.

commencement of the Deposited Assets Class claims process, since it was always envisioned that the claims process itself would generate additional data that would be useful to the analysis and award of bank claims.

It bears repeating that the Volcker Committee itself made clear that the processing of individual claims and the study of the related bank records would yield data that needed to be incorporated into the claims process, including data concerning account values:

> Integrating valuation information obtained in the course of claims processing does not impinge upon the findings of the Volcker Committee. In fact, the opposite is true: the Volcker Report explicitly anticipated that meaningful data about account values would be revealed *after the audit had been completed, as a result of the claims process*:
>
> > [T]he [Volcker] Committee has developed approaches toward approximating fair current values for individual accounts in situations where the book values are known. The Committee, with the support of the banks, believes that these approaches provide a reasonable and fair basis for making awards to identified Holocaust victims in a manner that takes account of the fact that these funds were unavailable to victims or their heirs for decades. But this approach cannot reasonably be aggregated over accounts where neither the book value nor a legitimate claimant, or both, can now be identified. *Such a determination of the overall total must await the outcome of the claims resolution process.*[3]

In light of the Volcker Committee's observations, it would have been inappropriate not to reassess the account values to take into account the data observed as a result of the claims process. Indeed, a member of the Deposited Assets Class advised me, as early as 2004, that the average values assigned by the ICEP auditors needed to be adjusted in light of the information obtained in the claims resolution process. Thus, he wrote:

---

[3]    Gribetz/Reig April 9, 2009 Report, at 4-5, citing, *inter alia*, Volcker Report, ¶ 36 (emphasis added).

[A] careful analysis of the individual adjudications shows that the average value of all the accounts where the documentation relating to value has not been destroyed is much higher than the average value of all the accounts where the documentation has been destroyed. This empirical conclusion, which arises from the adjudication process, and could not have been known at the time the assumptions were established, argues strongly in favour of increasing the amounts that have been paid out in respect of accounts where the documentation had been destroyed so as to reflect the more realistic averages that have been established empirically from the adjudication process.[4]

*(2) Scrubbing:*

The original presumptive values were derived during the course of the ICEP audit and were based upon information about approximately 54,000 accounts that had been identified by the auditors at that time as probably or possibly belonging to Nazi victims. Through the so-called "scrubbing" process, the Account History Database (AHD) of 54,000 accounts was reviewed and accounts were eliminated to the extent that they were "duplications and other technically-based unwarranted inclusions." It was expected that through "scrubbing," the AHD would be reduced to "between 45,000 and 50,000" relevant accounts.[5] "However, in the run-up to the publication of the 2001 list of names of Account Owners, the banks made further representations for additional exclusions, resulting in the elimination of more than twice the number of accounts ICEP had thought reasonable ...."[6]

As a result of "scrubbing," the data set available to the claims process is not identical to the data set that the auditors reviewed in assessing account values. A significant number of the known value accounts that were used in calculating the averages were removed by scrubbing (a reduction from approximately 54,000 to 36,000 accounts), while other known value accounts

---

[4]    *See* Letter of Tim Schwarz to the Court, January 30, 2004 (available at www.swissbankclaims.com/Archives).

[5] Junz Presumptive Value Memorandum of March 21, 2006, at 3; *see also* Junz Updated Memorandum of May 14, 2007, Appendix I, at 2.

[6] Junz Presumptive Value Memorandum of March 21, 2006, at 3-4.

were added as a result of independent CRT investigation of archival documentation and other sources. Since the data set itself has changed, it is not surprising that the valuation information for this data set now differs as well. Dr. Junz has demonstrated that scrubbing significantly impacted not only the number of accounts deemed to have been "probably or possibly" related to Holocaust victims but also the average value of those accounts.

*(3) New information:*

Since the inception of the claims process, the CRT, the Special Masters and Lead Settlement Counsel have persistently pursued information from Swiss banks and from other sources of information including European archives, claimant files and the like. As a result of these efforts, a wealth of data either inaccessible to or unreported by the auditors at the time of the audit has become available to the claims process.

*(4) Category 3 accounts:*

Dr. Junz also has demonstrated that the average values assigned at the inception of the process were based on what has proven to be an inaccurate premise: that the so-called "Category 3" accounts were not to be considered in calculating presumptive values. By way of background, the Volcker Committee Report classified the AHD accounts into four different categories. "Category 1" was comprised of 3,191 accounts. These were accounts "that remain open and dormant, were placed in suspense accounts, or closed after some period of dormancy, and matched exactly or almost exactly with names of known Holocaust victims or claimants."[7] "Category 2" consisted of "7,280 accounts that do not meet the exact or near-exact name matching test, but nonetheless have other characteristics that suggest that there may be a probable or possible relationship between the account holders and victims of Nazi persecution --

---

[7]     Volcker Report, at 10-11; *see also id.*, Annex 4 ("Identification of Accounts Probably or Possibly Related to Victims of Nazi Persecution").

Relevant Period accounts of people who were resident in an Axis or Axis-occupied country during that Period, that were either inactive for at least 10 years after 1945 or, in some cases, identified by the bank as the account of a victim, or otherwise met certain criteria."[8]

Category 3 consisted of "a much larger number of closed accounts -- 30,692 -- open in the Relevant Period by residents of Axis or Axis-occupied countries, matched exactly or almost exactly to names of victims," which "were closed (except for Germany) during or subsequent to the year of Axis occupation of the country of residence of the account holder or after the war. These characteristics are indicators of a probable or possible relationship of these accounts to victims." The Volcker Report noted that "these accounts have no direct evidence of an extended period of dormancy, or of unauthorized closure, important elements of the presumption that there was a relationship to a victim." However, the Report also pointed out that "14,716 of these accounts have unique name matches or have confirming factors," and a total of "15,980" had "unique or almost unique matches." These name matches therefore indicated "a significantly higher probability that the relationship of these accounts to victims is not simply a coincidence of common names but are genuine matches between account holders and victims of Nazi persecution."[9]

The claims process has demonstrated that the "Category 3" accounts, which were excluded by the ICEP auditors from their average value analysis, in fact should have been included in these calculations. These accounts were excluded because the auditors determined that there was a lower percentage of known value accounts in this category, and the known values were higher than those of other categories. The auditors also noted that accounts in this category had less evidence of being victim accounts. However, as a result of the claims process,

[8]     *Id.*, at 11 (footnotes omitted). The "name matching test" referred to the matching of account owner names to names appearing on victims' lists, including then-available lists from Yad Vashem and other sources.

[9]     Volcker Report, at 11 (footnote omitted).

many more values for Category 3 accounts were identified than originally had been available to the ICEP auditors, and these values were consistent with the higher values identified by the auditors. Further, the claims resolution process has made abundantly clear that these accounts did, in fact, belong to Holocaust victims. Accordingly, the accounts should have been included in determining account values and their inclusion significantly impacts the results.

III

Approximately one year ago, I authorized the CRT in Zurich and the Swiss Deposited Assets Program (SDAP) in New York to begin preparing the calculations, claimant notification materials, and other documentation necessary to issue a presumptive value increase to the several thousand individuals eligible to receive such adjustments. Because of the complexity of the process, requiring detailed, case-by-case analysis of each award -- often including several different account types divided among several different claimants and/or groups of claimants (not all of whom are related) -- it was imperative that this work commence well in advance of a formal decision on the presumptive value recommendations so as not to prolong the anticipated wind-down of the Deposited Assets Class claims process.

I was advised at that time by Dr. Junz that, based on then-extant exchange rates as well as the projections concerning the remaining CRT caseload, an increase in the presumptive value payments at 100% of the recommended amount would have required approximately $230 million, a sum that was not available under the Distribution Plan since it would have exceeded the up to $800 million allocated to the Deposited Assets Class. Taking into consideration the projected costs, and the fact that Dr. Junz' data are reliable and certainly far more accurate than the information provided at the outset of the claims process, but because of the destruction of millions of bank records, the precise averages for accounts with unknown balances never can be

determined with exactitude, I determined that a $100 million adjustment of the presumptive values was appropriate. This represented 43.5% of the $230 million needed to pay the recommended adjustment at the full amount, a sum comparable to the 45% increases authorized several years ago for the other four classes.

Specifically, on September 25, 2002, I authorized a 45% increase in payments to members of Slave Labor Class I (from $1,000 to $1,450) and the Refugee Class (from $500 to $725, for those admitted into Switzerland but mistreated, and $2,500 to $3,625, for those denied entry into or expelled from Switzerland). After the resolution of certain legal issues relating to Slave Labor Class II, I approved a similar 45% increase in payments to those class members (from $1,000 to $1,450). By contrast, members of the Deposited Assets Class have not received any payment increases at all, although the Court of Appeals has previously held that they have the strongest claims over the Settlement Fund. *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2001). Based on this adjustment alone, additional payments for bank account claims may well have been warranted even if Dr. Junz had not established that, in fact, Deposited Assets Class claims generally have been underpaid.

By adjusting the presumptive values in the manner described above, I am also able to authorize a similar 45% increase in payments to those members of the Deposited Assets Class who have received awards of $5,000 each for their plausible but undocumented claims ("Plausible Undocumented Awards" or "PUAs"). As is true for those with documented claims, these Holocaust victims and heirs have been adversely affected by the destruction of millions of bank records. There is a significant disparity between the PUA amount of $5,000, versus the current average value of an award based upon bank records and other documentation,

approximately $149,000.[10] The average value of an award will increase once the presumptive values are adjusted upward. While it is impossible to determine with certainty the true average value of an award premised upon an account for which all records have been obliterated, there is no doubt but that many PUA recipients have received far less than the payments that could have been made had their account documents not been destroyed by the Swiss banks. Those with plausible but undocumented Deposited Assets claims are at the very least entitled to receive the same 45% increase accorded to members of the other four classes whose legal claims were weaker. (The Looted Assets Class actually received more than a 100% increase.)

To date, approximately 12,300 Holocaust victims or heirs have received PUAs. Accordingly, each recipient will receive an additional $2,250 (45% of the $5,000 PUA amount). As a result of this additional funding, it is anticipated that Settlement Fund payments to members of the Deposited Assets Class will total approximately $726 million (consisting of the approximately $581 million paid to date; an additional $17 million expected to be paid for pending awards; the $100 million to be allocated for presumptive value increases; and the $27.7 million to be allocated for PUA increases).[11] That amount may still increase depending upon the disposition of Deposited Assets class appeals and other remaining claims, for which a $50 million reserve will be held.[12]

---

[10]    The average value of each awarded account is approximately $94,000; each award on average contains more than one account, resulting in an average award of approximately $149,000. In calculating the average value of CRT awards, certain unusually high awards were excluded because their size made them outliers that would have skewed the result.

[11]    These estimates are based on currently available information concerning the remaining CRT inventory but are subject to change as the CRT completes its claims processing activities.

[12]    It is unclear how much, if any, of the reserve will remain at the close of the claims process, or when the final sum will be known. For administrative efficiency, it may be more appropriate to allocate funds remaining from the reserve (if any) via ongoing programs rather than via agencies that are winding down their operations (namely, the CRT and SDAP).

The objections that have been filed in connection with Dr. Junz' recommendations by the State of Israel and Holocaust Survivors Foundation USA, Inc., would not justify the relief they ultimately seek -- distribution of the remaining funds for needy survivors -- even if they had any merit. Nevertheless, before explaining why, I observe that the specific objections to Dr. Junz' determination that the presumptive values should be increased and the specific objection to the methods that she used to determine the amount by which they should be increased are thoroughly discussed and analyzed in two documents that were filed by Judah Gribetz and Shari Reig. The first is entitled, "CRT Special Master Junz' Proposal for Adjustment of Deposited Assets Class Presumptive Values in the Context of the Settlement Agreement and the Distribution Plan" (Dec. 19, 2008). The second is entitled, "CRT Special Master Junz' Proposal for Adjustment of Deposited Assets Class Presumptive Values: Additional Contextual Analysis of Her Supplemental Report" (Apr. 9, 2009). Moreover, the request for additional discovery is addressed in Professor Neuborne's submissions of March 4, 2010 and June 14, 2010. I agree with Dr. Junz' recommendation that the presumptive values be upwardly adjusted and I agree with Professor Neuborne that the discovery requested should be denied. I do not address the objections and discovery requests in any more detail, because even if the objections had any merit, it would not result in an increase in the award to the Looted Assets Class that the objectors seek.

The asserted basis for the standing of the State of Israel and Holocaust Survivors Foundation USA, Inc., to object to the upward adjustment of the average value awards is the assumption that, if successful, I would award the residue to the Looted Assets Class. This would increase the $205 allocation that I have already made to the members of this Class, of which

$105 million reflects two earlier upward adjustments. This assumption is wrong. Even if I sustained the objection to her calculation I would not alter the amount of the award to members of the Looted Assets Class. First, as I observed in my opinion approving the settlement,

> The significance of the report of the Volcker Committee, which included three members appointed by the Swiss Bankers Association, is that it provided legal and moral legitimacy to the claims asserted here on behalf of the members of the Deposited Assets Class. *The findings suggest that the value of deposited assets held by the Swiss banks could exceed the $1.25 billion settlement amount. See* Volcker Report Annex 4 ¶¶ 41-42 & n. 23. Indeed, it is only the successful campaign that the Swiss banks waged to prevent disclosure before records were destroyed, Volcker Report ¶¶ 41(b), 48, that gave rise to the legal and practical impediments to the successful litigation of this case by the vast majority of individuals to whom money is justly due.

*In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 153-54 (E.D.N.Y. 2000) (footnote omitted) (emphasis added).[13] Indeed, it was only the Swiss Bank's insistence on a global settlement releasing all claims made against them in the complaint that necessitated setting aside the remaining $450 million to the other four classes, notwithstanding the fact that the claims of those other classes lacked any legal merit. As the Court of Appeals observed, in affirming a challenge to my decision approving the plan of allocation:

> [T]he district court did not abuse its discretion in allocating $800 million to the "Deposited Assets" class. The existence and estimated value of the claimed deposit accounts was established by extensive forensic accounting. In addition, these claims are based on well-established legal principles, have the ability of being proved with concrete documentation, and are readily valuated in terms of time and inflation. By contrast, the claims of the other four classes are based on novel and untested legal theories of liability, would have been very difficult to prove at trial, and will be very difficult to accurately valuate. Any allocation of a

---

[13] I described the methodology for obtaining this calculation in the footnote which I have omitted from the quotation. *See In re Holocaust Victim Assets Litigation*, 105 F. Supp. 2d at 153 n.2. Indeed, without burdening this opinion with technical analysis, it is fair to say that, because of the increase in value of the Swiss Franc relative to the U.S. Dollar since this calculation was made in 2000, the value of the deposited assets in today's dollars would far exceed the $1.25 billion settlement amount.

> settlement of this magnitude and comprising such different types of claims must be based, at least in part, on the comparative strengths and weaknesses of the asserted legal claims.

*In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2005); *see also* John Authers, *The Road to Restitution*, Fin. Times, Aug. 15, 2008 ("Rather than use the Swiss pay-out for a big charitable gesture, the US legal system had pulled the settlement towards a different version of justice. Banks could make good on their faults, and the often long-deceased owners of their accounts could receive the dignity they deserved, only if the court made every last attempt to make sure every surviving claimant received exactly their due.").

If the Swiss Banks had succeeded in destroying all records indicating the value of particular accounts, thereby making it impossible to establish actual or average values for different categories of accounts, I would have simply divided the award *pro rata* to those claimants who made a satisfactory showing of an entitlement to an account. Because all of those records were not destroyed, however, there was a reasonable basis on which to judge the average values for particular categories of accounts. No objection was voiced to the calculation of the average values in 2001.

Dr. Junz, as I have already observed, has simply used data that were not available at the time of the initial audit by the Volcker Committee to recommend an upward adjustment. Nevertheless, even without the new data on which she relied, I would not have taken funds that belonged to the Deposited Assets Class and awarded them to members of the Looted Assets Class. Instead, I would have done something comparable to the intra-subclass *pro rata* approach described above, and the result for the members of the Looted Assets Class -- who were not legally entitled to any award -- would not have changed.

The legal justification for what I have just described lies, first, in the discretion that I have with respect to the administration and allocation of settlement funds. As the Court of

Appeals has observed in an earlier appeal related to this litigation, "the district court has broad supervisory powers with respect to the administration and allocation of settlement funds, and we will disturb the scheme adopted by the district court only upon showing of an abuse of discretion." *In re Holocaust Victim Assets Litig.*, 424 F.3d 132, 146 (2d Cir. 2005) (internal quotations omitted). Indeed, the approach I would have taken to allocating the funds belonging to the Deposited Assets Class is comparable to the intra-subclass approach that I took with respect to the Looted Assets Class. When it became clear that it would have been administratively inefficient to create an individualized claims process intended to determine, from among more than a million potential claimants, including victims and heirs, what property was looted and whether it was transacted through Switzerland, I adopted a *cy pres* remedy to benefit the neediest members of the Looted Assets Class whose assets had been presumed to have been looted. But for this program, the neediest survivors would not have been eligible for any special payments whatsoever under the Swiss Banks settlement. The humanitarian aid programs were not negotiated under the settlement by the objectors, nor by any other interested parties.[14] Rather, these assistance programs are the result of the recommendations set forth in the Proposed Plan of Allocation and Distribution of Settlement Proceeds, and my agreement that the Settlement Fund should provide a measure of meaningful, not token, compensation to members of the Looted Assets Class. Because of the adoption of this intra-subclass *cy pres* remedy, more than 231,000 needy survivors throughout the world have received food, medical assistance, emergency grants, winter relief and similar aid through Court-funded programs.

In the course of upholding my decision, the Court of Appeals observed that "it may be appropriate for a court to use *cy pres* principles to distribute unclaimed funds." *In re Holocaust*

---

[14] Indeed, one of the objectors, Holocaust Survivors Foundation USA, Inc., asked the Supreme Court to strike down the *cy pres* distribution to the neediest victims on the grounds that it was "unlawful." Reply Brief for Petitioner 5, *In re Holocaust Victims Assets Litig.*, 547 U.S. 1206 (No. 05-1275) (2006).

*Victim Assets Litig.*, 424 F.3d 158, 161 n.2 (2d Cir. 2005). Because *cy pres* means "as near as possible," as applied to class actions, *cy pres* principles compel the distribution of unclaimed funds "for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated." *Id.* (citation omitted). The legitimate objective underlying this lawsuit was the recovery of assets deposited in Swiss banks by Jewish victims of Nazi persecution. Indeed, as I have previously observed, "[t]he heart of this case and the only cause of action capable of surviving a motion to dismiss turned on the failure of Swiss banks to honor their contractual and fiduciary duties to their depositors .... The other claims against the Swiss banks, while not without a moral basis, were not sustainable." *See In re Holocaust Victim Assets Litig.*, 270 F. Supp. 2d 313, 321 (E.D.N.Y. 2002). Under these circumstances, even if there were unclaimed funds because of the destruction of the records by the Swiss Banks, the "next best" use that would serve the interest of class members would be an allocation to the members of the Deposited Assets Class and not to the members of another class whose claims are unsustainable. Indeed, the case for such an intra-subclass *cy pres* distribution is far stronger than the case for the comparable *cy pres* distribution to members of the Looted Assets Class. Unlike the members of the latter class, who cannot establish any connection to specific wrongdoing by any Swiss entity that would entitle them to relief, a *cy pres* distribution within the Deposited Assets Class would benefit only those who have made a satisfactory showing of entitlement to assets deposited in Swiss banks during the Holocaust era.

In sum, because Dr. Junz' reports merely incorporate fundamental corrections to the data obtained as a result of the claims process, and in the absence of a reasonable basis for challenging the new data, I adopt Dr. Junz' recommendations in principle. Nevertheless, as previously noted, I authorize the additional presumptive value payments to be issued in the total

amount of $100 million, representing approximately 78% of the $128 million in funds remaining after all anticipated distributions are made (and a reserve held for appeals and other claims) in connection with the Deposited Assets Class. As previously noted, I also authorize an additional $27.7 million to be distributed on a pro rata basis to the approximately 12,300 members of the Deposited Assets Class who have received (or may in the future receive) awards for their plausible but undocumented claims. The assets they deposited in Switzerland never can be precisely determined because the banks destroyed the relevant account records. The disparity between the $5,000 PUAs and the $149,000 current average award based upon documentation is striking. It is therefore appropriate to increase the PUAs at the same time that an adjustment is made for those with documented claims.

I have held in reserve the remaining funds, up to $50 million, to satisfy all appeals as well as several pending decisions which could possibly result in significant awards or could necessitate additional reserves for unanticipated appeals. Until these last decisions and appeals are resolved, it would be irresponsible to earmark for any purpose sums that have been and must be allocated to Deposited Assets Class claims.

## CONCLUSION

The Value Presumptions for Accounts with Unknown or Low Values, as set forth in Article 29 of the Rules Governing the Claims Resolution Process, are to be adjusted as follows:

**Article 29 Value Presumptions for Accounts with Unknown or Low Values (1945 Values).**

| Account Type | Original Article 29 Presumptive Value | Revised Article 29 Presumptive Value | Adjusted Value |
|---|---|---|---|
| Savings | 830.00 | 900.00 | 860.00 |
| Demand Deposit | 2,140.00 | 2,500.00 | 2,297.00 |
| Custody | 13,000.00 | 31,000.00 | 20,830.00 |
| Safe Deposit Boxes | 1,240.00 | 5,300.00 | 3,006.00 |
| Unknown * | 3,950.00 | 3,950.00 | Not applicable |
| Other | 2,200.00 | 3,900.00 | 2,940.00 |

*The average value for accounts of unknown type remained the same. As the presumptive value for this type of account remains unchanged, no adjustment is warranted.

The vast majority of the preparatory materials for more than 6,400 individuals who are slated to receive presumptive value payment adjustments now have been finalized. In the interest of avoiding further delay and in completing the distribution process, and in the exercise of my discretion, the CRT and the New York-based Swiss Deposited Assets Program of the CRT shall commence the process necessary to effect the supplemental presumptive value payment. In accordance with Dr. Junz' recommendations, all presumptive value payment increases shall be issued utilizing a common exchange rate: 1.21 Swiss Francs per 1.00 U.S. Dollar, which is based on the average rate of the period between 1 October 2003 and 21 April 2009.[15] This rate shall also be used to calculate deductions made to recoup awards to certain accounts. For these accounts, evidence made available to the CRT after the original awards were issued indicates that no award was appropriate; for example, because the newly available information shows that the claimants' relatives were not the account owner or that the accounts were closed properly. In such cases, no additional payment is warranted, and amounts corresponding to the previous overpayments -- calculated at the common exchange rate of 1.21 Swiss Francs per 1.00 U.S. Dollar -- are to be deducted from any presumptive value increases made to the relevant claimants.

---

[15]  *See* Letter from Special Master Helen B. Junz, April 21, 2009.

As the claims process draws to its conclusion, it is worth noting again that members of the Deposited Assets Class will have received approximately $726 million (and perhaps more); members of the two Slave Labor Classes, the Looted Assets Class and the Refugee Class will have received more than $504 million; and well over 450,000 victims of the Holocaust and their heirs will have received payments in excess of the $1.25 billion Settlement Amount. Moreover, I add these words with respect to the up to $800 million that was allocated to the Deposited Assets Class. The economic recession with which this century began, the economic crisis which ensued from the 9/11 terrorist attack in 2001, and the global economic crisis, which began in 2007, have resulted in interest rates that are at historic lows. The economic instability that accompanied that last decade also helped facilitate an extraordinary decline in the value of the U.S. Dollar against the Swiss Franc. These circumstances could not be anticipated when the determination was made in 2002, because of unexpected additional income generated by a tax exemption on the Fund as well as interest income, to increase by 45% the payments allocated to members of the two Slave Labor Classes, the Refugee Class, and the Looted Assets Class. Due to all of these factors, the amount available for distribution to the Deposited Assets Class is approximately $776 million (as compared with the up to $800 million allocated). However, as noted previously, more than the $1.25 billion Settlement Fund will have been paid to Holocaust victims and their heirs when the distribution process is complete.

Dated:    Brooklyn, New York
          June 16, 2010

                                        SO ORDERED:

                                        *Edward R. Korman*
                                        _____
                                        Edward R. Korman
                                        United States District Judge